LOUISIANA PROGRESS OIL, Inc., v.
McDANIEL.

No. 3854.

Court of Civil Appeals of Texas. Beaumont.
July 3, 1941.

Rehearing Denied Oct. 1, 1941.

A. Frank Smith, Jr., Frank G. Dyer, and Vinson, Elkins, Weems & Francis, all of Houston, for appellant.

Merrill & Scott, Sam D. W. Low, and Lawrence DuMars, all of Houston, for appellee.

O'QUINN, Justice.

May 8, 1937, Grubb & Neville, a partnership composed of M. T. Grubb and W. C. Neville, entered into the following contract with Louisiana Crusader Oil, Inc., name changed during progress of this suit to Louisiana Progress Oil, Inc.:

"May 8, 1937.

"Grubb & Neville
"2516 Gulf Building,
"Houston, Texas.

"Dear Sirs:

"Subject to the conditions hereinafter stated, we agree to pay you $35,000 for the following described acreage:

"(The acreage all situated in Livingston Parish, Louisiana, is here specifically described in the contract, and will not be copied here.)

"We are to pay you $5,000 when a well is spudded in Section 47, Twp. 7S, Rge. 3E, Livingston Parish, Louisiana, and deposit an irrevocable letter of credit in the Second National Bank of Houston, Texas, for the remaining $30,000, which will be paid to you when you reach a depth of 8,000 feet, or commercial production of oil and/or gas. Should heaving shale, salt, or other impenetrable formation be encountered before the well reaches 8,000 feet, then the payment shall be in proportion to the footage actually drilled.

"You are to furnish us with assignments to the above described leases, as well as approval of title to said leases by a reputable attorney, prior to the time that the $30,000 is paid.

"You are to drill said well to a depth of 8,000 feet, or commercial production of oil and/or gas, with due diligence and reasonable dispatch. If at any time you or your contractor fail to make any hole for as long

as thirty (30) days, then we have the right to take over operation of said well and use the rig which is on the location free of cost to us. The cost of operations, should we take over the well, shall be deducted from the $30,000 which is to be paid you on completion of the well.

"Yours very truly,
"Louisiana Crusader Oil, Inc.,
"By (Signed) Austin B. Taylor
"President

"Accepted: This the 8th day of May, 1937.
"Grubb & Neville
"By (Signed) Maurice T. Grubb
"By (Signed) W. C. Neville."

June 24, 1937, appellee, J. A. McDaniel and Grubb & Neville entered into the following contract:

"June 24, 1937.

"Messrs. Grubb & Neville
"2516 Gulf Building
"Houston, Texas.

"Dear Sirs:

"Referring to the letter written you on May 8, 1937, by the Louisiana Crusader Oil Company, 2706 Gulf Building, Houston, Texas, please be advised that I will accept the contract to drill a well in Livingston Parish, Louisiana, according to the following terms and stipulations, to-wit:

"(1) I agree to furnish a complete drilling rig and derrick sufficient to drill this well to an 8,000 feet depth, and to begin operations by July 1st, 1937.

"(2) That the contract price shall be thirty two thousand five hundred ($32,500.-00) Dollars, two thousand five hundred ($2,500.00) dollars of which shall be paid to me when well is spudded in. The remaining thirty thousand ($30,000.00) dollars to be placed in escrow in the Second National Bank and paid to me subject to the fulfillment of the conditions set out in the letter of the Louisiana Crusader Oil Company above mentioned and a copy hereto attached as a part thereof.

"(3) That the following acreage shall be assigned to me when contract is completed, the acreage being: (Here certain acreage is set out.)

"(4) That it be explicitly understood that I shall have an undivided one-fourth (¼) interest in the 80 acre drilling block surrounding the well site and in case the first well is a producer, I agree to bear a one-fourth (¼) part of the cost of operation of said 80 acres after the completion of first said well and agree to put up a one-fourth part of the cash necessary for future operations on the mentioned 80 acre drilling block.

"(5) That Grubb & Neville shall furnish all necessary Schlumberger tests at their own expense.

"(6) That it is mutually agreed that said well be drilled according to stipulations set out in the above mentioned letter of Louisiana Crusader Oil Company, and that if the above is according to your understanding please indicate your acceptance in the space provided below and return this copy for my files.

"Yours very truly,
"(Signed) J. A. McDaniel.

"Accepted:
"Grubb & Neville,
"By (Signed) M. T. Grubb
"By (Signed) W. C. Neville."

June 28, 1937, appellee, Grubb & Neville, and appellant under its former name, and Second National Bank of Houston entered into the following written contract:

"Houston, Texas, June 28, 1937.
"Second National Bank of Houston,
"Houston, Texas.

"Gentlemen:

"Simultaneously herewith there is being deposited with you Letter of Credit No. 93556, dated June 24, 1937, in favor of Grubb & Neville, 2516 Gulf Building, Houston, Texas, signed by the First National Bank of Boston, Boston, Mass., for the principal amount of thirty thousand dollars ($30,000). This letter of credit is deposited with you pursuant to the terms of contract dated May 8, 1937, addressed to Grubb & Neville, 2516 Gulf Building, Houston, Texas, signed by Louisiana Crusader Oil, Inc., and signed and accepted by Grubb & Neville, by Maurice T. Grubb and W. C. Neville, which has reference to the purchase of acreage and drilling of a well for oil, gas, and other minerals, copy of which contract is also being deposited with you herewith. This contract relates to lands situated in Livingston Parish, Louisiana, which lands are described in the contract.

"By contract entered into between Messrs. Grubb and Neville to and with Mr. J. A. McDaniel, of Houston, Texas, Messrs. Grubb and Neville have transferred and assigned to J. A. McDaniel all their right to the $30,000 payment provided to be paid under the terms of the contract

if, as, and when the contract has been fully complied with by Messrs. Grubb & Neville.

"If, as, and when the contract between Grubb and Neville and Louisiana Crusader Oil, Inc., attached hereto, has been fully complied with and the $30,000 provided to be paid Messrs. Grubb and Neville thereunder becomes due and payable in accordance with the terms of the contract, you are requested and authorized to honor draft in the amount of $30,000 in favor of J. A. McDaniel drawn against the attached letter of credit.

"We will advise you by letter signed by the Louisiana Crusader Oil, Inc., when the contract has been complied with, and upon receipt thereof you will be authorized to honor the draft in favor of Mr. McDaniel hereinabove referred to. Please return the attached Letter of Credit to us after the payment has been made to Mr. McDaniel.

"Yours very truly,
"Louisiana Crusader Oil, Inc.
"By (Signed) Austin B. Taylor.

"Agreed to this 28th day of June, A. D. 1937.
"Grubb & Neville
"By (Signed) Maurice T. Grubb
"(Signed) W. C. Neville.
"(Signed) J. A. McDaniel.

(The following written in pen and ink:)
"6–30–37
"Received the above letter of credit, copy of contract and agreement in escrow #1277
"Second National Bank
"A. C. Parker, Escrow Agent."

Appellee sued appellant and Grubb & Neville for damages for breach of these contracts. For cause of action he alleged the three contracts, that within the time required by said contracts he spudded in the well provided for in said contracts and at that time was paid the initial payment of $2,500 due him under said contracts; that he continued to drill the well until at a depth of 7,656 feet he encountered a cavity which he alleged as an impenetrable formation within the meaning of the contracts. "That under the terms of said contract and agreement and under the facts herein alleged the clause therein contained, 'should heaving shale or salt or other impenetrable formation be encountered before the well reaches 8,000 feet, then the payment shall be in proportion to the footage actually drilled,' meant and was intended to mean that upon the en-

countering of such impenetrable formation as herein defined plaintiff had fully complied with his drilling contract and that the defendants were then required to pay him for the drilling of said 7,656 feet of the hole at the rate of 4.375 per foot, or a total of $33,495 less the $5,000 theretofore paid by defendant corporation as hereinabove alleged, leaving an unpaid balance of $28,495.00 due plaintiff for which he here sues"; that he demanded of Louisiana Progress Oil, Inc., that it pay him said sum of money "but that defendants and each of them and especially the defendant corporation, wrongfully and without just cause or reason failed and refused to make such payment or cause the same to be made, and declared that the reason for their refusal was their opinion that cavity in which said drilling mud had been lost did not constitute an impenetrable formation within the meaning of said contract, and that plaintiff had not fulfilled his drilling obligation by drilling said well to said cavity at a depth of 7,656 feet. That neither of the defendants, at the time plaintiff so demanded payment of the sum due him under the terms of the contract, or at any time prior to the filing of this suit, made any statement or representation to plaintiff that he was not entitled to be paid because of the fact or based their refusal to pay him on the ground that any leases which the defendant corporation had contracted to receive from the defendants Grubb & Neville had not been delivered but wrongfully based their refusal to pay the plaintiff the sum due him on the ground, and solely and only on the ground, that plaintiff had not in fact encountered an impenetrable formation within the meaning of the terms of the contract."

We quote as follows from appellant's answer, which was duly verified: "Defendant further represents to the court that the consideration for the payment of the $35,000 which this defendant agreed to pay Grubb & Neville by the terms of the contract entered into between it and them, a copy of which is marked Exhibit 'A,' attached hereto and made part hereof for all purposes, was the assignment to this defendant of the leases mentioned in said contract. That this defendant had paid to Grubb & Neville $5,000 of said sum of $35,000 in accordance with the terms of said contract, but has never paid

the defendants Grubb & Neville or the plaintiff J. A. McDaniel the remaining $30,000 sued for herein for the reason that the consideration for said $30,000 has never been furnished to this defendant, and for the reason that the terms of said contract have never been complied with, and this defendant pleads that no consideration has passed to it for said sum of $30,000 and that said consideration has failed."

Appellee plead estoppel as against appellant on the theory of its answer.

The court submitted to the jury by the following twelve questions, all answered in the affirmative, the issues made by the pleadings:

"Special Issue No. 1.

"Do you find from a preponderance of the evidence that in the drilling of the well in question the plaintiff, J. A. McDaniel, encountered at a depth of approximately 7656 feet a formation then known in the oil drilling industry of the Gulf Coast area as a cavity?

"Special Issue No. 2.

"Do you find from a preponderance of the evidence that the term 'impenetrable formation' had during the months of May and June, 1937, a generally accepted and understood meaning within the oil drilling industry in the Gulf Coast area?

"Special Issue No. 3.

"If you have answered the next two preceding special issues 'Yes,' and only in that event, then answer this issue:

"Do you find from a preponderance of the evidence that such cavity, if any, encountered in the well in question, was an impenetrable formation?

"Special Issue No. 4.

"Do you find from a preponderance of the evidence that the plaintiff, J. A. McDaniel, exercised due and reasonable diligence in an effort to complete the drilling of such well to a total depth of 8,000 feet?

"Special Issue No. 5.

"Do you find from a preponderance of the evidence that the defendants, Grubb & Neville, at the time of the ceasing of drilling operations by the plaintiff, McDaniel, or within a reasonable time thereafter, could have obtained for delivery to the defendant, Louisiana Crusader Oil, Inc., assignments of all the leases described in the letter of May 8, 1937?

"Special Issue No. 6.

"Do you find from a preponderance of the evidence that after plaintiff, J. A. McDaniel, had ceased drilling operations on said well and had made demand for payment from the defendants, Louisiana Crusader Oil, Inc., a representative or representatives of that defendant stated positively to the defendants Grubb & Neville, or either of them, that they would refuse to accept assignments of the leases in question?

"Special Issue No. 7.

"If you have answered the next preceding special issue 'Yes,' and only in that event, then answer this issue:

"Do you find from a preponderance of the evidence that such declaration, if any, induced the defendants, Grubb and Neville, not to undertake the collection of such leases for delivery to the Louisiana Crusader Oil, Inc.?

"Special Issue No. 8.

"If you have answered the next preceding special issue 'Yes,' and only in that event, then answer this issue:

"Do you find from a preponderance of the evidence that but for such statement, if any, of the intention, if any, of defendant Louisiana Crusader Oil, Inc., to refuse to accept assignments of the leases, the defendants Grubb & Neville would have secured and delivered the assignments of the leases in question to Louisiana Crusader Oil, Inc.?

"Special Issue No. 9.

"Do you find from a preponderance of the evidence that at the time of the request by plaintiff, J. A. McDaniel, for payment for the drilling of the well in question, the defendant, Louisiana Crusader Oil, Inc., based its refusal to pay plaintiff solely on the ground that the well had not been completed in accordance with the drilling contract?

"Special Issue No. 10.

"Do you find from a preponderance of the evidence that prior to the time the plaintiff, J. A. McDaniel, agreed with defendants, Grubb & Neville, to drill the well in question herein, the defendant, Louisiana Crusader Oil, Inc., told said plaintiff, J. A. McDaniel, that it would look alone to defendants Grubb & Neville for the delivery of the assignments of the leases involved in the transaction?

"Special Issue No. 11.

"If you have answered the next preceding special issue 'Yes,' and only in that event, then answer this issue:

"Do you find from a preponderance of the evidence that the plaintiff, J. A. McDaniel, believed and relied upon such statements, if any, of Louisiana Crusader Oil, Inc.?

"Special Issue No. 12.

"If you have answered the next preceding special issue 'Yes,' and only in that event, then answer this issue:

"Do you find from a preponderance of the evidence that but for such belief, if any, on the part of plaintiff, McDaniel, said McDaniel would not have entered into the contract with the defendants, Grubb & Neville, for the drilling of the well in question?"

June 27, 1940, on the jury's verdict, judgment was rendered in favor of appellee against appellant for the sum of $33,339.-20, with interest and costs. Judgment was in favor of Grubb & Neville as against appellee, and that they recover nothing against appellant on their cross action. The appeal was prosecuted to the Galveston Court of Civil Appeals and is on our docket by order of transfer by the Supreme Court.

There is no proposition against the judgment in so far as it relates to Grubb & Neville; in this respect the judgment is affirmed.

Appellant's first point is that it was entitled to an instructed verdict on two grounds: (1) Because appellee's cause of action was for specific performance and not for damages, on the ground that he "failed to tender or offer assignments to said leases to the defendant on the trial of this cause as a condition precedent to judgment for said purchase money." His second ground for an instructed verdict is that appellee "failed to tender assignments of said leases to Louisiana Progress Oil, Inc., either in his pleadings or on the trial of this cause, plaintiff failed to prove any cause of action against this defendant for the purchase price of said leases."

The suit was for damages for breach of contract, was tried on that theory and judgment was entered for appellee on that theory. The petition covers thirty-three pages of the transcript and is too long to review paragraph by paragraph. Its nature is accurately reflected by the prayer:

"Wherefore, premises considered, plaintiff prays for judgment as the law and facts may warrant against defendants Louisiana Progress Oil, Inc., and M. T. Grubb and W. C. Neville, and the firm of Grubb & Neville jointly and against said defendants severally, and against said defendants jointly and severally as the law and facts warrant, for the amount due under his said contract in the sum of Twenty-eight Thousand Four Hundred Ninety-five ($28,-495.00) Dollars, and that he have judgment for his costs and for interest at the rate of 6% per annum from date such debts become due, and for all such other or further or different relief, special and general, at law and in equity as he may be justly entitled to receive."

█ Appellant was not entitled to an instructed verdict on the second ground under his first point for the reason that the evidence raised the issue that it had breached its contract and rendered further performance by the opposite parties impossible; and that it had elected to stand on its contention that the drilling contract had not been complied with until all rights of the opposite parties to acquire the leases had been lost by lapse of time. The record is undisputed that appellee spudded in its well within the time provided in the contract; that the cores and cuttings taken during the drilling of the well showed that the formations were running low, which indicated that the area would probably not produce oil or gas. After appellee had completed his drilling obligations, he called on appellant for payment of the agreed compensation, which appellant refused to make on the sole ground that the well had not been completed in accordance with the terms of the contract. On this issue appellee testified (Q. & A. reduced to narrative):

"In trying to get the money from the Crusaders I came to town and went up to see Mr. Fly (Mr. Fly was the agent of appellant with authority to act) and demanded payment. Mr. Fly told me that he didn't consider the job completed, and that he wasn't going to pay anything, or wasn't going to spend anything, wasn't going to pay any of the $30,000 to me. He just told me that he didn't consider. the job completed and wasn't going to pay off for it. As a matter of fact, I didn't drill 8,000 feet; I drilled 7,656 feet to an impenetrable formation. Mr. Fly told me that he didn't consider the job completed and that he

wasn't going to pay anything; wasn't going to spend anything; wasn't going to pay any of the $30,000 to me; just told me that he didn't consider the job completed and wasn't going to pay off for it."

After appellant had refused payment to appellee, Grubb & Neville called on appellant's authorized representatives and offered to make the lease assignments as provided in the contract. They were told that the well had not been completed according to the contract, and that no leases were due and that none would be accepted if tendered. Appellant asked Grubb & Neville not to take any steps to secure the lease assignments from the Humble Oil & Refining Company, and from the others with whom they had contracts, as it desired to stand on the proposition that the well had not been drilled according to the contract and no lease assignments were due. On these issues, Mr. M. T. Grubb testified (Q. & A. reduced to narrative):

"The next day—I am not certain, after McDaniel quit operations Mr. Nevill and I saw Mr. Fly and talked with him. I told him first that McDaniel advised me that he had completed the contract; I asked Mr. Fly had McDaniel completed the contract, and he said no. I asked Mr. Fly what he based that on, and Mr. Fly told me that Mr. McDaniel spent about 20 or 25 minutes pumping mud in and had pulled out, on information from the Crusader scout, and that in their opinion effort had not been made to go through the cavity. In respect to the delivery of the leases, well, I explained what Mr. Nevill's and my position was in the matter to Mr. Fly; I told them that we had never been on the well, and that the last time we had purposely refrained from going to the well, and that he wanted to deepen the well if possible, and if it was not possible, and if they wanted to accept the well, that we were ready and willing at all times, although from what he had told us we did not consider the contract completed, we were willing to rely on the Crusader, if they wanted to accept it as completed, that we would go and get the leases for them. Mr. Fly said he didn't want the leases. Later he asked me not to try to get the leases. I couldn't tell you the exact meeting at a later date, probably about two weeks later. About that time I had a sprained back and when McDaniel and Fly were having their conversations I was unable to come to town, so when I came back later I offered to assign the two leases that I had in my possession to the Crusader, and the Crusader, being Mr. Fly, I believe, at that meeting, refused to accept delivery of those two leases by me, and I also asked Mr. Fly if he would take the Humble, Superior, and Showers & Moncrief leases if we could get assignments to those various leases—I didn't know at that time whether we could get assignments to them or not, I will grant that—but Mr. Fly said that he would not accept assignments to those various leases, and he told us not to bother with the leases, he didn't want us to try to get the leases."

Following these conversations, Grubb & Neville made no further effort to secure and deliver to appellant the lease assignments. Appellee never owned or claimed to own any leases in the vicinity of the test well; he had no right to acquire the leases except under the terms of his contract; he never in any manner obligated himself to deliver to appellant the leases called for by the letter of May 8, 1937. The facts raised in appellee's favor the issue of estoppel plead by him against appellant's right to receive the delivery of the leases.

Appellant was not entitled to an instructed verdict on its proposition that appellee "failed to prove that either he or Grubb & Neville ever owned a portion of said leases which were to be assigned to Louisiana Progress Oil, Inc., and having failed to prove that either he or Grubb & Neville were ever able, or in a position to assign said leases to said defendant, the plaintiff failed to prove any cause of action against this defendant for the purchase price of said leases." The case was not tried on the theories submitted by this proposition, and the evidence as we have summarized it above raised against appellant the issue that it did not contract with appellee on this theory, and that it did not refuse to pay him on this theory. Appellee testified that if appellant had told him that they were not going to pay because Grubb & Neville had not delivered the leases, he would have demanded that Grubb & Neville deliver the leases. Grubb and Neville testified that when appellee completed his drilling contract they took up with appellant the matter of the lease assignments, as detailed above, and were told that appellant did not want the leases, and also asked them not to request assignments from Humble Oil & Refining Com-

pany, Showers & Moncrief, and Superior Oil Company. Appellant never changed its position on this issue, that no leases were due and none would be accepted if offered, until after this suit was filed. The issue was raised that, if appellant had not stated to Grubb & Neville that they would not accept the leases if tendered, they would have taken the necessary steps to secure them, that they did not take the necessary steps to secure the leases because of the positive statement by appellant that it would not accept them. This statement overrules appellant's proposition, that special issue No. 5 was not raised by the evidence, and the jury's answer thereto was without support in the evidence.

 The court did not err in submitting to the jury special issue No. 10. The submission of this issue in no way prejudiced appellant's right before the jury, and its effect on the verdict was an issue of law for the court to decide.

The court did not err in admitting the following testimony: (a) By appellee, "Mr. Fly told me that he was thoroughly satisfied about the leases. That he knew that Mr. Grubb and Mr. Neville had them or he would not be paying out this $5000 when this well was spudded in"; (b) by appellee:

"Q. What, if anything, did he (referring to Mr. Fly) say to you with respect to your duty or obligation or anything of that kind about seeing to the delivery of the leases? A. He merely told me that Mr. Grubb and Mr. Neville had the leases and my job was to dig this well and I need not worry about the leases; that he knew Mr. Grubb and Mr. Neville had the leases."

Appellant had examined these leases and had approved the titles thereto. Certainly no error was committed in permitting appellee to testify that Mr. Fly told him he was satisfied with them. Mr. Fly's statement that Grubb & Neville had the leases, that he knew they had the leases, and that it was appellee's "job" to dig the well and not to worry about the leases, in no way varied the terms of the written contract, but was simply appellant's construction of the contract; Mr. Fly's conversations with appellee after the well was drilled also supported the construction of the contract as made in the testimony complained of. It follows that the court did not err in refusing to strike this testimony. The court did not err in permitting appellee to testify that he believed and relied upon the statements of Grubb & Neville, and Mr. Fly, to the effect that Mr. Fly knew that Grubb & Neville owned the leases and that it was appellee's duty merely to drill the well and not to worry about the leases. The conversations had by appellee with Mr. Fly after the well was drilled sustained his contention that the conversations complained of were merely Mr. Fly's construction of the contract.

In our opening statement we say that the court's charge submitted all the issues raised by the pleadings of the parties. There is no assignment that the court erred in refusing to submit any issue to the jury. The evidence satisfactorily supports the jury's findings on all questions submitted, and the jury's findings clearly sustained in appellee's favor its plea of estoppel against appellant's defenses.

It follows that the judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.

Affirmed.